IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:06CR3177 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| SILVIA OCHOA-GONZALEZ, | ) | REPORT, RECOMMENDATION |
| | ) | AND ORDER |
| Defendant. | ) | |

Defendant has filed a motion to suppress statements. A hearing on the motion was held before the undersigned on September 25, 2007 and October 9, 2007, at the conclusion of which the parties were permitted to submit post-hearing briefs. The motion was submitted on November 7, 2007. For reasons discussed below, I conclude the motion should be granted in part.

The motion arises from an "enforcement operation" ("operation") conducted by the United States Immigration and Customs Enforcement Agency ("ICE") at the Swift and Company packing plant in Grand Island, Nebraska on December 12, 2006. The operation was authorized by a "Warrant for Entry on Premises to Search for Aliens Who Are in the United States Without Legal Authority" issued by United States Magistrate Judge Thomas D. Thalken. Exhibit 3. In the course of that operation defendant was arrested and now has been charged in a superseding indictment with four counts of possession and misuse of a forged passport bearing a false "adit" stamp, and one count of aggravated identity theft. Superseding Indictment, Filing 22.

FACTS[1]

The court was requested to and did take judicial notice of the pretrial services report.  Without going into personal details, it shows the defendant to be 46 years of age with a fifth-grade education in Mexico.  She had lived in Grand Island, Nebraska and worked at the Swift plant for approximately seven years prior to her arrest on December 12, 2006.  She has no prior criminal record.  Her primary language is Spanish, and in these proceedings has always used an interpreter.

The Swift and Company packing plant in Grand Island contains approximately 565,000 square feet of space and is located on 80 acres of fenced land.  The plant has a work force of approximately 2,600 employees, many of whom are non-United States citizens. Exhibit 3.

On Tuesday, December 12, 2006, between 7:00 and 8:00 a.m. more than 200 ICE agents arrived at the Swift and Company Packing Plant (hereinafter "Swift" or "plant") in Grand Island, Nebraska.  The agents' purposes were to conduct an enforcement operation pursuant to an administrative warrant of entry, to search for and identify illegal aliens found on the property, to question suspected illegal aliens, and, upon probable cause following investigation, to arrest them.  Id.  The operation followed a months-long investigation in which ICE agents had discovered several actual instances of illegal aliens using forged or stolen documents to obtain employment at the plant, and additionally, the identification of 792 of the plant's 2,645 employees whose documentation ICE regarded as "suspect."  Id.

---

[1] Citations to the transcript of the hearing will be designated by "T." followed by the page number(s).

2

According to the affidavit in support of the application for the warrant,

> It is anticipated that any aliens found not to be legally entitled to be present in the United States will be administratively arrested and either ordered to appear for removal hearings before an immigration judge or offered voluntary departures to their home countries as appropriate per current law and agency policies. It is also anticipated that some of these individuals will be presented for prosecution for violations of Title 18, United States Code, Section 1015(e) (False Statement in Connection with Application for Employment), Title 18 U.S.C., Section 1546, (Fraud and Misuse of Visas, Permits, and other Documents), Title 18 U.S.C., Section 1028A (Aggravated Identity Theft), Title 18 U.S.C., Section 911 (False Claim to US [sic] Citizenship), Title 8 U.S.C., Section 1326[a] (Reentry of a Deported Alien), and other violations of federal law associated with immigration violations and identity documents.

Exhibit 3, Affidavit in Support of Application, Paragraph 23.

The operation was carried out according to an "Enforcement Operation Plan" which named it "Operation Wagon Train." Exhibit 101. The Plan was distributed to ICE agents participating in the operation at a briefing held Sunday, December 10, 2006 in Omaha. Many, if not all, of the ICE agents who participated in the operation attended the briefing, at which they received general instructions, a description of the plant, maps, guidelines on dress during the operation, and other instructions. Participating agents were from Nebraska and several other states.

Michael Wardy was the supervisor in charge of the operation. He testified there were 209 ICE agents who participated, plus three detention officers and bus drivers on each of eight buses. Agents were assigned to various "teams," each of which was given responsibilities for various tasks. Exhibit 101, Attachment 2.

3

Some agents were assigned to more than one team.  Approximately 300 employees were detained, and 261 of them were arrested; some of the arrestees were taken to the ICE office in Grand Island, but most were transported to Camp Dodge, Iowa.

Most of the participating agents were dressed in tactical or "raid" gear, that is, armed (guns were in holsters and visible but never drawn), bulletproof vests, dark jackets bearing large lettering clearly identifying them as ICE agents, and dark pants. Most, if not all of them also carried "soft" plastic handcuffs.[2]

On the morning of the operation Wardy arrived in the first team of agents and met with the senior human resources person at the plant.  She took Wardy to the plant manager, who had been notified of the action ahead of time, and who cooperated in the staging of the operation.  T. 162-163.  The plant manager ordered the production line closed down, progressively as the last "product" moved through the line.  T. 164.  Then Swift managers ordered all employees to report to the two cafeterias[3] of the plant.  T. 164-165.  According to Wardy, Swift management wanted to resume production at the completion of the operation, so wanted all employees to be accounted for.  T. 182.  ICE agents were stationed "near" all exits of the plant, although they were instructed not to "block" the doors.  T. 166.  Fifty agents were stationed around the plant site's perimeter, which was enclosed by an eight-foot fence topped with barbed wire.  There are two entrance gates, each with

---

[2] These were never thoroughly described in the evidence, sometimes being referred to as "ties" with which agents bound the hands of some arrestees.

[3] Testimony was not entirely clear on whether the plant has one or two employee cafeterias.  As any distinction is immaterial, I shall refer to the cafeteria(s) in the singular.

4

a security checkpoint.   There is also a secure gate for trucks
entering and leaving the plant.   ICE agents joined Swift employees
already at the security checkpoints while others checked the
stockyards and truck areas.   T. 168.

ICE agents clearly anticipated that some employees, realizing
that their immigration status would be checked, would attempt to
avoid the agents and try to either leave the plant or hide.   Wardy
testified that agents were assigned to go through the production
areas to find people who had not gone to the cafeteria, to question
people trying to leave the plant, to accompany people going to
restrooms, and to inspect all areas in and around the plant to
ensure that all employees were brought to or reported to the
cafeteria.   T. 182-183.   It was Wardy's view that if an employee
attempted to hide or flee, that constituted probable cause for an
agent to arrest that employee, although the agent observing the
employee was authorized to "make that call."   T. 165.   Wardy
testified that ICE agents were instructed to ask any people trying
to leave the plant why they were leaving, but if they continued to
leave, to let them go (T. 168); however, the Swift managers advised
such employees that if they left, they would be terminated.   He
stated he saw three employees leave under such circumstances.   T.
186.   However, Wardy also testified that if any employees tried to
hide or flee the plant, they were "apprehended" by ICE agents,
detained, and brought to the cafeteria by those agents.   T. 180-
182.

Swift managers ordered all employees to report to the
cafeteria.   ICE agents were among employees as they walked there,
and some agents were stationed along the way.[4]   ICE agents told the

_____

[4] Agent Vera testified he was in the hall to the cafeteria
"letting them [employees] know where the cafeteria was."   T. 10.

5

employees in the hallway to the cafeteria that they were not to use their cell phones, and they were not to go unaccompanied to their employee lockers to retrieve their immigration documents.  T. 271-272.  Once in the cafeteria, however, employees were permitted to use cell phones to call family or friends to request them to bring the employees' immigration papers to the plant.  T. 132.

ICE agents were "posted"[5] at every doorway of the cafeteria. Once at the cafeteria, employees were directed to divide themselves into "citizens" and "non-citizens."  ICE agents began checking documents.  If employees said their immigration documents were in their employee lockers, "quick checks" were done by ICE agents to determine whether they might be illegally in the United States, and those employees thought to be illegal or possibly illegal were individually accompanied to their lockers to retrieve the documents.  T. 10-11.  Employees who needed to use a bathroom were individually escorted to and from the rest rooms.  T. 90-91.  No employees were searched or patted down before or after going to their lockers or to the rest rooms.  Wardy testified that the locker rooms are connected to rest rooms, and in his experience, illegal aliens have hidden above the false ceilings in the rest rooms of this plant to avoid detection.  If employees' immigration documents were not on their persons or at the plant, they were permitted to telephone family members to bring the documents to the

_____

[5] The term "posted at" was not clearly defined in the evidence. Wardy testified that it meant to "observe activity, see what was happening in that area...."  T. 215.  However, he also apparently agreed with the prosecutor's suggestion that it meant that "nobody enters or exits." Id.  The exact language is as follows:

Q.  So does post at mean nobody enters or exits?
A.  I believe posted at doorways -- yes, sir, I believe they did not enter.
Id.

plant; however, once the documents were brought to the facility, Swift personnel took the documents without permitting the person delivering them to enter through the gates.  Wardy testified that this was not at the request of ICE.  The documents were then given to ICE agents who in turn brought them to the cafeteria and gave them to the named person so the person could proceed with processing.

Employees determined to be United States citizens or legal permanent residents were escorted from the facility, but according to the plan of operation, were not to be removed from the plant site; rather, they were to be "directed by plant management to remain outside the facility or in an alternate staging area until it is deemed safe for them to return to work."  Exhibit 101, Attachment 4, p. 11.  One such employee testified that when she tried to leave the plant site after being processed, she was told by an ICE agent that she could not leave, and he instructed her to go back into the plant.  T. 284-285.

Remaining employees were processed by a 20-agent "triage team"[6] who checked documents and gave wristbands to quickly identify them as illegal/deportable aliens (blue); or primary care givers or problem cases (yellow).  Those with yellow wristbands were to be taken to the Grand Island ICE office for further processing or checking; all others were removed from the facility in buses bound for Camp Dodge in Iowa.  Exhibit 101, Attachment 2, p. 9.

---

[6] Agent Vera testified there were 10-15 agents in the cafeteria and over 200 employees there.  I take his testimony as an estimate only; there is no reason to believe that the Operation Plan's assignment of 20 agents to this team was not carried out.

Defendant was working on the production line at the time the operation commenced.  She was directed to go to the cafeteria.  She complied.  There, she took her Mexican passport (Exhibit 1) to ICE Agent Jose Vera, an agent from Puerto Rico assigned to "inspect" employees there by checking their documents.  T. 14-15.

Vera examined the passport, and noticed two possible problems with it:  First, in the temporary entrance stamp, the word "temporary" was missing the "t" and the ending letters of the word "authorized" were missing; second, the stamp purported to authorize defendant to be in the United States from August 20, 2006 to August 20, 2007 instead of August 19, 2007, that is, the date of the expiration of the authorization was one year and one day after admission, rather than the customary one-year authorization issued by ICE.  Exhibit 1, page 2.  This portion of the passport is referred to as the "adit" stamp for reasons not explained at the hearing.  T. 17.

Vera asked defendant where she got the "adit" stamp.  T. 19-20.  She said, "From the immigration office."  He told her he thought it looked "not right" (T. 19) or "no good" (T. 20) and asked again where she got it.  He told her to tell him the truth.  Id.  She said, "Yes, I got it from the immigration office."  Id.  Not convinced, Vera asked her what her immigration status was and how she got resident status, so he could check her answer against the "W 16" notation on the "class" portion of that page of the passport.  T. 21.  She looked nervous, then said the stamp was no good and that she was illegal.  She told Vera she'd bought the stamp from someone.  Id.  At that point Vera asked no more questions, but took the passport to another agent and told him she had admitted to a "false adit stamp."  T. 22-23.  That agent referred her to Agent Carmen Morales's "illegal" line for further

8

processing.  Vera did not tell defendant she was under arrest, did not restrain her, and did not tell her either that she could or could not leave the area.  He never touched her and never obstructed her movement.  He did not read her any *Miranda*[7] rights and did not hear any other ICE agent do so.  T. 23-24.

Carmen Morales, another ICE agent from Puerto Rico, also participated in the operation.  She escorted some of the women employees from the cafeteria to their lockers or restrooms and back, both for officer safety reasons as well as to ensure they returned to the cafeteria.  T. 117-118.  She did not tell people they were under arrest or could not leave, although she did get one pregnant employee an ambulance and SRT/first aid team of ICE employees.  She was wearing "raid attire" including a bulletproof vest and a weapon holstered in a thigh holster.  T. 92-93.

Morales was sitting at a table and was assigned the task of processing employees by getting their "biographical" information, taking their documents and the contents of their pockets, and taking their pictures.  She also placed wristbands on those she found to be primary care givers.  T. 93-94, 103.

The defendant was brought to Agent Morales's table by another ICE agent.  He gave Morales defendant's passport and told Morales that defendant had a "false adit stamp."  T. 115.  He also told Morales to be sure to get all of the defendant's biographical information and write it down.  T. 95.  The agent spoke in English and was within earshot of defendant.    Morales testified that at that point Ochoa was not free to leave.  T. 137-142.

---

[7] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Morales used a Form 213 to record defendant's information.
Exhibit 2.   In response to Morales's first question put to the
defendant, "What is your full and complete name?" T. 129,
defendant, who was seated across from Morales, leaned over the
table in what Morales thought was an intimidating manner, and told
Morales that "what we were doing wasn't right; that she knew the
stamp was false, but that if I had children, I would know that you
would do anything in order to keep your family and in order to
provide for them." T. 100-101.  Morales interrupted defendant and
told her to cooperate, which she then did, crying.      M o r a l e s
completed the form with defendant's information, asked for and
received the contents of her pockets, took her picture, gave her a
"primary care giver" wristband, and gave her over to the "the next
agent" who were loading employees into the buses.  T. 103.   The
entire interaction between defendant and Morales took no more than
five minutes.  <u>Id</u>.  Morales never read defendant any *Miranda* rights
and did not hear anyone else do so.  T. 130-131.  Morales did not
ask the defendant anything about her passport.  T. 104.

Defendant was taken to Camp Dodge, Iowa with many others
arrested that day on suspicion of being illegally in the United
States.   The following day, December 13, she was interviewed by
David Hoagland, an ICE Enforcement Agent then stationed in Cedar
Rapids, Iowa.   Hoagland was processing the arrestees for possible
deportation and removal from the country.   In the interview with
the defendant, Hoagland asked the defendant about her immigration
status and the legitimacy of her passport and the "adit" stamp.  T.
233-234.  He also inquired about her Social Security card.  T. 235.
Defendant made a number of incriminating statements in response to
Hoagland's questions.  At the end of the interview Agent Hoagland
printed and served defendant with a notice to appear before an
immigration judge and an administrative arrest notice.  T. 231.

10

He did not read her any *Miranda* warnings at any time during the interview and had no knowledge that any other ICE agent had done so.  T. 230, 236.  The interview ended at 12:01 p.m.  T. 237. Later, at "1500 hrs," defendant was read her *Miranda* rights by other officers, but she invoked her right to counsel and chose not to talk with the officers.  Exhibit 102.

## POSITIONS OF THE PARTIES

Defendant argues that she was "in custody" at all times beginning with when she was detained in the Swift plant's cafeteria.  She was interrogated by ICE agents without being *Mirandized*.  She also claims that her statements were not voluntarily made and should be suppressed as violative of her Fifth Amendment right not to incriminate herself.

The government argues that the actions taken by ICE agents during the operation were taken in accordance with the provisions of 8 U.S.C. § 1357.  It also contends defendant was not "in custody"[8] until after she was processed by Agent Morales and taken to board a bus to be taken to Camp Dodge Iowa.  The government has now stated that it will not use any of the information received or statements made by the defendant in the first interview on December 13 as part of its case in chief.  Finally, the government claims that all statements made by the defendant even when she was in custody were given voluntarily.

---

[8] Actually, the government argues that the defendant was not "seized" for Fourth Amendment purposes.  Post-Hearing Brief, Filing 82, pp. 11-17, citing Immigration and Naturalization Service v. Delgado, 466 U.S. 210 (1984).

11

DISCUSSION

The government argues that the use of the defendant's statements is permissible pursuant to 8 U.S.C. § 1357, which permits immigration officers to "interrogate any alien or person believed to be an alien as to his right to or to remain in the United States [and] to arrest any alien in the United States, if [the agent] has reason to believe that the alien so arrested is . . . in violation of any such law or regulation *and* is likely to escape before a warrant can be obtained." (Emphasis added). The government does not argue that statements taken pursuant to that statute may be used against a defendant in a criminal case, despite the constitutional constraints of the Fifth Amendment. The statute has been construed to apply only to administrative matters. <u>United States v. Kahn</u>, 324 F. Supp. 2d 1177 (D. Colo. 2004). Regardless, the government has not shown that there was, at the time of the initial contact between defendant and Agent Vera, any basis to believe the defendant would abscond before an administrative warrant could have been issued to her directing her to appear before an immigration judge. In fact, the defendant is now on release status from both this court and from the decision of an immigration judge. Thus, the second requirement of the statute has not been shown to apply. See, <u>United States v. Flores-Sandoval</u>, 422 F.3d 711 (8th Cir. 2005). I proceed, therefore, to the constitutional claims.

I must first decide whether, and if so when, the defendant was "in custody" of the ICE agents. If she was, I must also decide whether the statements she then made were in response to "interrogation." Finally, I must decide whether her statements were voluntarily made.

12

"In Custody"

"*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.'" United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004)(quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (emphasis in original)). "The ultimate inquiry to determine custody for *Miranda* purposes is whether there was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); United States v. Czichray, 378 F.3d 822, 828 (8th Cir. 2004).

There are two discrete inquiries essential to the "in custody" determination.  The court must consider:  1) the totality of the historical circumstances confronting the suspect; and 2) given those circumstances, whether a reasonable persons would consider their freedom of movement restricted to the degree associated with a formal arrest.  Black Bear, 422 F.3d at 661;  LeBrun, 363 F.3d at 720 (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  The Eighth Circuit has identified the following factors for the court's consideration in determining whether a suspect was "in custody:"

> (1) whether the suspect was informed that he or she was free to leave or was not under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
>
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
>
> (4) whether police used strong-arm tactics or deceptive strategies during questioning;

13

(5) whether the atmosphere of the questioning was police-dominated; and

(6) whether the suspect was arrested at the end of the questioning.

United States v. Galceran, 301 F.3d 927, 929-930 (8th Cir. 2002). See also Black Bear, 422 F.3d at 662-663; United States v. Brown, 990 F.2d 397, 399 (8th Cir. 1993), quoting United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990). This list is not exhaustive, and no one factor is necessarily dispositive. Galceran, 301 F.3d at 930. Rather, the court must look at the totality of the circumstances of the encounter, keeping mindful that the determination is based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." LeBrun, 363 F.3d at 720 (quoting Stansbury v. California, 511 U.S. 318, 322-23 (1994)).

The "circumstances" presented in this case began with over 200 ICE officers arriving unannounced[9], requesting that the management of the Swift plant shut down production. Swift management agreed to do so. Once that was done, even though technically the Swift supervisors may have been giving employees directives, such directives were at the request of ICE. ICE agents were all dressed in "raid" gear, armed, and assigned to "post" at doorways, and to ensure that all employees were taken to the plant cafeteria for

---

[9] There was some testimony to the effect that some of the Swift plant management may have been aware that the operation was going to happen, and some may have known that it was going to happen that day. The employees, however, were not told anything about it beforehand.

14

processing.   Employees were not told they could leave, and very few, if any, did.[10]

Defendant was never told she could leave.  Defendant was never told she could refuse to answer questions.  She was not told she was not under arrest, nor that she would not be arrested or deported after the questioning stopped.  She was never advised that her answering questions was voluntary, nor that she did not have to produce immigration documentation on the spot.  This factor weighs strongly in favor of a finding of custody.

Likewise, defendant was restrained in her movement at all times after she was instructed to go to the cafeteria.  Although she was not physically restrained in the sense of being bound and gagged, or even cuffed, the evidence establishes that no employee was permitted to leave the cafeteria without being accompanied by an ICE agent until their immigration documents had been "inspected" by ICE agents and then only if they were found to be legally in the United States.  There is simply no evidence from which a person in the defendant's position, whether innocent or not, could have reasonably inferred that she was free to move about the plant or to leave the plant until ICE had finished with her.  Under these circumstances it is not realistic to characterize the defendant's movements as "unrestrained."  This factor weighs in favor of a finding of custody.

---

[10] Agent Wardy testified that he saw three employees leave the plant in an automobile, but there was no testimony as to whether they were allowed to leave the plant site, that is, whether they were intercepted at one of the checkpoints on the site's perimeter.

Regarding the third factor, the government presented no evidence of any "official request"[11] to which the defendant "voluntarily acquiesced" in "respond[ing] to questions." In fact, the government's witnesses all testified that no ICE personnel ordered anyone to do anything. Therefore, plaintiff is limited to showing that defendant "initiated contact with authorities." Defendant did not initiate the contact with ICE. She was ordered to go to the plant cafeteria, and she complied with those orders. There was no "acquiesce[nce]" to any "official request."

The government has not argued that the defendant's approaching Agent Vera was an "initiation" of contact. Even if that argument had been raised, however, defendant's approach to Vera took place after she was already restricted in her movements to staying in the cafeteria unless accompanied by an ICE agent to go elsewhere, or, after her interaction with Agent Morales, "handed off" to another agent to be transported elsewhere. This situation is not comparable to those typical in the case law where officers request a suspect to travel to the police station to be questioned, or even when a suspect is interviewed in his or her own home. Defendant was confronted with a situation in which it was quite apparent that the only way she was going to get out of the cafeteria was to show herself to be either a lawful United States citizen or otherwise entitled to an immigration status permitting her to work at the plant. That she tried to expedite the process by approaching Vera with her passport does not amount to an "initiation" of contact for purposes of considering this factor. This factor also weighs in favor of a finding of custody.

---

[11] In fact, the government's argument that all requests, orders, directives, and commands to the employees were issued not by ICE personnel but by Swift management personnel would seem to foreclose such an argument.

16

Regarding the fourth factor, there is no evidence that any "strong-arm" tactics were used by any of the agents with whom the defendant spoke. There were no threats, promises, bargains, deceptions or other "inducements" made to her by any agent. There is no evidence that defendant was ever touched by any ICE agent. This factor weighs decidedly against a finding of custody.

However, to say that the atmosphere was "police dominated" is truly an understatement. Although the government attempts to argue that it was not, solely on the basis that the employees were outnumbered "nearly 10 to 1," (Filing 53, p. 6), that is inconsequential in the face of facts that all of the ICE agents were dressed in raid gear, armed, stationed near or in at least all exits, and not permitting any employee to leave the cafeteria until ICE agents completed examining them. This was a "coercive environment." Arizona v. Mauro, 481 U.S. 520, 529-30 (1987). Swift management and supervisors were carrying out the requests of ICE that all employees be taken to the cafeteria and their documents examined; that Swift management, not ICE agents did the ordering does not equate to establishing any "free will" on the part of employees. To believe that ICE was not ordering the employees held would frankly require a parsing of words accompanied by a wink and a nod. Even if one believes the testimony of the agents that all of the employees were free to leave had they wanted to--which I find totally incredible—-the agents successfully created the impression, even if technically false in fact, that no one was going to leave the plant until they said so. This factor weighs heavily in favor of a finding of custody.

Finally, the defendant was arrested after answering Agent Morales's questions. She was transported to Camp Dodge, Iowa, where she was kept overnight and again interrogated the following

day. There is no evidence she was handcuffed at any stage in these procedures, but she was "restrained to a degree normally associated with formal arrest." United States v. Newton, 369 F.3d 659, 676 (2d Cir. 2003). She was not, on December 12, merely issued a summons to appear before an immigration judge for determination of her status; that did not happen until the following day in Iowa. This factor favors a finding of custody.

There is one other circumstance to be considered in this case. This was not an individual occurrence. It was a huge operation involving over 200 armed ICE agents and the detention of some 300 employees and the arrest of 261 of them. It temporarily shut down production in a huge meat processing plant. The testimony amply demonstrates that the employees in the cafeteria were upset, some crying, and some angry to the point that agents had to separate them and ask them to calm down. Their supervisors and the management of the plant had essentially joined the ICE agents in carrying out the operation; there is no evidence of anyone with any authority doing anything to ameliorate the restrictions placed on the employees. A reasonable person--innocent or not, and legal or not—-seeing and hearing coworkers in such an atmosphere would feel even more powerless to resist or attempt to challenge the actions or authority of the agents than would be expected in an action involving a single suspect in a different, calmer atmosphere. While I consider that this circumstance was present, because it, too, would auger in favor of a finding of custody, it is merely cumulative; I do not consider it independent of any of the other factors discussed above.

Considering all of the circumstances described in the evidence before the court, I conclude that the defendant was "in custody" beginning when she was ordered to go to the cafeteria. At that

point in time her own control over her ability to leave the plant
for any reason not pre-approved by ICE ended.

"<u>Interrogation</u>"

        "To qualify for the Fifth Amendment privilege, a communication
must be testimonial, incriminating, and compelled."   <u>Hiibel v.</u>
<u>Sixth Judicial Dist. Ct. of Nev., Humboldt Cty</u>., 542 U.S. 177, 189
(2004).   "Interrogation," as conceptualized in the <u>Miranda</u> opinion,
"must reflect a measure of compulsion above and beyond that
inherent in custody itself." <u>Rhode Island v. Innis</u>, 446 U.S. 291,
300 (1980).   Interrogation includes not only express questioning by
the officer, but also any words or actions which "police should
know are reasonably likely to elicit an incriminating response from
the suspect."   <u>Holman v. Kemna</u>, 212 F.3d 413, 417 (8th Cir.
2000)(citing <u>Innis</u>, 446 U.S. at 301).

        In deciding whether particular police conduct is
        interrogation, we must remember the purpose behind our
        decisions in <u>Miranda</u> and <u>Edwards</u>[12]: preventing government
        officials from using the coercive nature of confinement
        to extract confessions that would not be given in an
        unrestrained environment.

<u>Arizona v. Mauro</u>, 481 U.S. 520, 529-30 (1987).

        It is clear that the questions Agent Vera asked the defendant
were "interrogation."   They went to the very offenses with which
she now stands charged.   They sought incriminating facts, and their
answers were incriminating.   As defendant had not been *Mirandized*,
the statements made to Agent Vera should be suppressed.

_____

        [12]<u>Edwards v. Arizona</u>, 451 U.S. 477 (1981).

19

The first question asked of defendant by Agent Morales was her "full and complete name."   T. 129.   "One's identity is, by definition, unique; yet it is, in another sense, a universal characteristic.   Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances."  Hiibel, 542 U.S. at 191.   While the Court acknowledged that "a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual," (Id. at 179), in this case the defendant did not respond to the question, so that issue does not arise.   Instead, she began a series of statements to Agent Morales.

To find the question, "What is your full and complete name?" to be "interrogation," would require the court to infer that an officer in Agent Morales's position would reasonably believe that asking the defendant for her "true and complete name" would "likely elicit an incriminating response."  Innis, 446 U.S. at 301.   To get to such a conclusion would require inferring (a) defendant knew or believed that Agent Vera had communicated to the English-speaking agent what the defendant had said to him; and/or (b) defendant knew what the English-speaking agent had said to Agent Morales; and © Agent Morales would therefore know or reasonably think that the defendant would likely feel compelled by her earlier conversation with Vera to try to explain herself, and further that her answer to the question would incriminate her.   The evidence does not support such inferences.   In the totality of the circumstances here, I conclude that asking the defendant for her name was not, in and of itself, interrogation.   The statements of the defendant in response to that question should not be suppressed.

20

The parties agree that the questions asked of the defendant by Agent Hoagland were interrogation while the defendant was "in custody" without first giving her the *Miranda* warnings. They should therefore be suppressed from use in the government's case in chief.

"<u>Fifth Amendment and Voluntariness of Statements</u>"

The issue remains whether the statements made by defendant, even though she was not given *Miranda* warnings, were nevertheless made voluntarily. Spontaneous statements voluntarily made by a defendant while in custody are not protected by the Fifth Amendment or the exclusionary principles of <u>Miranda</u>. <u>United States v. Aldaco</u>, 477 F.3d 1008, 1016 (8th Cir. 2007); <u>Butzin v. Wood</u>, 886 F.2d 1016, 1018 (8th Cir. 1989)(quoting <u>United States v. Rhodes</u>, 779 F.2d 1019, 1032 (4th Cir. 1985). Resolving that issue requires the court to determine whether the defendant's will to remain silent was overborne and her capacity for self-determination critically impaired. <u>United States v. Santos-Garcia</u>, 313 F.3d 1073, 1079 (8th Cir. 2002).

I earlier concluded that the totality of the circumstances demonstrated that the atmosphere in the cafeteria on December 12, 2007 was "coercive." It is clear from the evidence that defendant's statements in response to Agent Vera's questions were made, at least partially, also in response to that coercive atmosphere. The question is whether it was to such a degree as to conclude that the atmosphere overbore the defendant's will to remain silent. I am not persuaded that the atmosphere contributed much to the defendant's willingness to answer Vera's questions; to the contrary, although the atmosphere was charged and coercive, I

21

think she would have answered the questions even if she had been the only person being held under calmer circumstances.

There were no particular actions taken by any ICE agents directed to the defendant individually, no threats, promises, deceptions or bargains, and the defendant was not physically touched. I do not find any overreaching by the agents that would have overcome defendant's will to remain silent. I therefore conclude that her statements, in all three instances, were voluntarily made.

Summarizing, I conclude that the defendant's statements made in response to Agent Vera's questions and those made in response to Agent Hoagland's questions were the result of unconstitutional custodial interrogation and should not be permitted to be used in the government's case in chief. Defendant's statements made to Agent Morales should be permitted to be used in the government's case in chief.

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B) that the defendant's motion to suppress, filing 46, should be granted in part and denied in part in accordance with the foregoing.

FURTHER, IT HEREBY IS ORDERED,

1. Counsel are given ten days from this date in which to file objections to this recommendation. The parties are notified that failure to object to this recommendation as provided in the local rules may result in a waiver of the right to appeal the district judge's adoption of findings in the recommendation.

2. Trial of this matter is set to commence at 9:00 a.m., February 11, 2008, before the Honorable Richard G. Kopf in Courtroom 1, United States Courthouse and Federal Building, 100 Centennial Mall North, Lincoln, Nebraska. Jury selection will be held at commencement of trial.

Dated December 10, 2007.

                              BY THE COURT

                              s/ David L. Piester
                              David L. Piester
                              United States Magistrate Judge